**Marc P. Berger**
**Sanjay Wadhwa**
**Sheldon L. Pollock**
**Daniel Michael**
**Osman Nawaz**
**Philip A. Fortino**
**Lindsay S. Moilanen**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**(212) 336-1014 (Fortino)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **20 Civ. ____** |
| **Plaintiff,** | |
| **-against-** | **COMPLAINT** |
| **DAVID HU,** | |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendant David Hu ("Hu" or "Defendant"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This civil action concerns a string of frauds by Hu and others to cover up tens of millions of dollars in losses on bad bets in order to keep his investment advisory business, the International Investment Group LLC ("IIG"), afloat.

2.      Until recently, IIG was an investment adviser that specialized in trade finance lending—risky loans to small- and medium-sized companies in emerging markets.  IIG and Hu, as IIG's chief investment officer, served as the investment adviser to several private investment

funds—the Trade Opportunities Fund ("TOF"), the Global Trade Finance Fund ("GTFF"), and the Structured Trade Finance Fund ("STFF") (collectively, the "Private Funds")—and in that capacity, selected and managed the Private Funds' investments, principally in trade finance loans.

3.      Beginning in or about 2007,[1] Hu and others at IIG engaged in a practice of hiding losses in the TOF portfolio by overvaluing troubled loans and replacing defaulted loans with fake "performing" loan assets.  When it was necessary to create liquidity, including to meet redemption requests, Hu would cause IIG to sell the overvalued and/or fictitious loans to new investors, including, ultimately, to GTFF and STFF, and use the proceeds to generate the necessary liquidity required to pay off earlier investors.

4.      In addition to the Private Funds, IIG also advised an open-end mutual fund marketed to retail investors (the "Retail Fund") and selected trade finance loans for the Retail Fund's portfolio.  In or about March 2017, the borrower of one of the loans IIG had recommended had defaulted on a $6 million payment.

5.      Concerned that the default would lead the Retail Fund to end the advisory relationship, Hu directed others at IIG to use funds from an account under its control to make the defaulted payment, making it appear that the borrower was creditworthy and current in its payments.  To plug the $6 million hole it had created in the other account, IIG, at Hu's direction, sold the Retail Fund a new fake $6 million loan and used those funds to reimburse the account it had raided to make the earlier payment to the Retail Fund.

6.      Through the conduct alleged herein, Hu is liable for violating Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"); Section 10(b) of the Securities

---

[1]      Hu has agreed to toll the statute of limitations for the period of October 1, 2018 to July 31, 2020.  The Commission is seeking relief only for the violations by Hu alleged herein occurring after October 1, 2013.

Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and Section 17(a) of the Securities Act of 1933 ("Securities Act").

7.      The relief sought in this action is necessary to, among other things, restrain and enjoin Defendant from violating the federal securities laws.

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to authority conferred by Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and seeks to restrain and permanently enjoin Defendant from engaging in the acts, practices, transactions, and courses of business alleged herein, and such other and further relief as the Court may deem just and appropriate.

9.      The Commission also seeks final judgments ordering Defendant to: (a) disgorge his ill-gotten gains, together with prejudgment interest thereon and (b) pay civil monetary penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)], Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.      Venue is proper in this District pursuant to Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)] because many of the acts and transactions constituting violations of the Advisers Act occurred within the Southern District of New York.  Venue also is proper in this

District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the acts and transactions constituting violations alleged in this Complaint occurred within the Southern District of New York, where Hu and IIG's offices were located.

12.     In connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, made use of the means or instrumentalities of transportation or communication in, and the means or instrumentalities of, interstate commerce.

## **DEFENDANT**

13.     Hu is age 60 and resides in West Orange, New Jersey.

14.     During all relevant times, Hu was a founder, a managing partner, and chief investment officer of IIG, as well as a 50 percent owner of the firm.  In his capacity as chief investment officer, Hu held primary responsibility for IIG's investment advice and implementing that advice on behalf of IIG's clients.

15.     Hu previously held Series 7, 24, and 63 securities licenses and was a registered representative associated with the broker-dealers IIG Horizons Securities, LLC from March 1997 to February 2012, Smith Barney Inc. from 1993 to 1994, and Nomura Securities International, Inc. from 1991 to 1993.

# FACTS

## Background on the Private Funds and Trade Finance Loans

16.     From its inception in 1994 until November 2019, when its registration as an investment adviser was revoked by the Commission,[2] IIG specialized in advising clients with respect to investments in emerging market economies.  In or about 1998, it launched TOF.  IIG launched GTFF and STFF in June and July 2017, respectively.  All three Private Funds had the stated strategy of investing in trade finance loans.

17.     Trade finance loans are loans made to small- to medium-sized businesses, usually commodities exporters located in emerging markets, such as Latin America.  The loans are typically risky investments because the borrower's ability to repay could be impacted by less stable regulatory and economic conditions in the borrower's home country.  In order to mitigate the risk of these investments, trade finance loans typically are secured by collateral, which may include one or more of receivables, inventories, and assets.

18.     All three of the Private Funds were marketed to qualified institutional investors, including pension funds, insurers, and hedge funds, as a way for these prospective investors to diversify their portfolios with exposure to trade finance loans in Latin America.

19.     In offering memoranda and other communications, IIG touted its risk control strategies, which included portfolio concentration limits at the borrower, country, and commodity level.  It also touted its robust credit review process for borrowers.

---

[2]     In November 2019, IIG consented to the entry of a partial judgment in *SEC v. International Investment Group LLC*, 19 Civ. 10796 (S.D.N.Y.) (DLC), which, among other things, enjoined it from violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and (2) of the Advisers Act.  IIG also contemporaneously consented to a Commission order revoking its registration on the basis of the injunction.  On March 30, 2020, the Court entered a final judgment against IIG on consent, ordering it to pay over $35 million in disgorgement and pre-judgement interest.

20.    Hu prepared valuations of the Private Funds on a regular basis including through a determination of the funds' net asset values ("NAV"), and IIG received compensation based on the NAV and performance calculations.  Hu virtually always valued every trade finance loan in the Private Fund portfolios at par plus accrued interest throughout the entire life of the funds.

**Hu Hides Losses in TOF**

21.    Beginning in or about 2007, Hu, with others, engaged in various deceptive acts to misrepresent the performance of and conceal losses in TOF, including overvaluing portfolio assets and replacing non-performing assets with fictitious loans that were reported as if they were legitimate performing assets.

22.    In or about 2007, when TOF's gross asset value was approximately $300 million, IIG learned that a South American coffee producer had defaulted on a $30 million loan (the "Coffee Loan") by TOF.

23.    Fearing that existing investors would flee the fund and that ongoing fundraising efforts would suffer if the loss were disclosed, IIG's two co-owners, Hu and Executive-1, decided to conceal the loss and knowingly incorrectly valued the loan at par plus accrued interest on the TOF's books.

24.    The overvaluation of the Coffee Loan materially inflated the NAV reported to TOF investors.

25.    When it became untenable to continue to carry the Coffee Loan on TOF's books as a performing asset due to auditor scrutiny, Hu and Executive-1 removed the Coffee Loan from the firm's books and replaced it with fake loans to different borrowers (each, a "Substitute Loan").  The purported borrowers were foreign companies operating in other industries that were controlled by a business associate of IIG.  Accordingly, the purported borrowers never received

anything of value from TOF, and there was no expectation they ever would make any payments to TOF.

26.     Hu and Executive-1 directed that documentation be created to evidence each Substitute Loan for audit purposes.  In addition, starting in about 2010, Hu and Executive-1 arranged for the purported borrowers to provide confirmations of the fake debts to auditors.  In one case, with Hu's knowledge and approval, Executive-1 arranged for TOF to pay a monthly fee to a purported borrower in exchange for receiving such false confirmations.

27.     In or about 2010, a seafood producer defaulted on another sizeable TOF loan of approximately $30 million to (the "Seafood Loan").  As in the case of the loss on the Coffee Loan, Hu and Executive-1 agreed to hide the new loss by first continuing to value the Seafood Loan at par plus accrued interest and, when that became untenable, then removing the Seafood Loan from the portfolio and replacing it with additional Substitute Loans.

28.     Over time, as new losses arose or as the fictitious loans matured, Hu and Executive-1 would remove them from the TOF portfolio and replace them with additional Substitute Loans.

29.     Hu and Executive-1's practice of overvaluing loans, including valuing the worthless Substitute Loans in the tens of millions of dollars, artificially inflated TOF's NAV and resulted in IIG receiving management and performance fees to which it was not entitled.  As a co-owner of IIG, Hu received distributions of a portion of these excess fees.

### Hu Defrauds New Investors to Keep TOF's Losses Under Wraps

30.     In or about November 2013, TOF continued to have liquidity problems due to investor redemption requests, as well as repayment obligations on loans the fund had taken from international development banks.

31.     In order to help meet these liquidity needs, and to continue to conceal TOF's losses, Executive-1 spearheaded an effort to securitize the TOF loan portfolio.

32.      Ultimately, as a result of Executive-1's efforts, IIG obtained bank financing of approximately $220 million to capitalize a collateralized loan obligation trust (the "CLO").

33.     IIG, which served as the investment adviser to the CLO, then caused the CLO to use some of its capital to acquire existing trade finance loans from TOF.  The CLO retained additional capital to make new trade finance loans.

34.     Once it had acquired these assets from TOF, the CLO issued bonds to investors, backed by the cash flows the CLO received from the trust's assets.

35.     The proceeds to TOF from the sale of these loans to the CLO were not sufficient to meet TOF's liquidity needs.

36.     Beginning in late 2014 and continuing through at least September 2016, in order to generate more liquidity, Hu diverted some of the remaining cash from the CLO to TOF.

37.     To disguise the transactions, Hu caused the CLO to make new loans to at least seven Panamanian shell companies (the "Panama Loans") secretly owned by IIG, but instead of directing the money to the supposed borrowers, Hu directed that it be transferred to a TOF account and used to pay TOF's liabilities.

38.     Hu, with the assistance of a senior IIG employee ("Employee-1"), acquired the shell companies that were the nominal borrowers on the Panama Loans and procured fraudulent promissory notes memorializing the Panama Loans.

39.     The Panama Loans were worthless.  Nonetheless, IIG valued the fake assets in the tens of millions of dollars on the books of the CLO.

### Hu Offloads Fake and Troubled Loans to New Clients

40.     In or about 2017, TOF's liquidity needs persisted, and the notes issued by the CLO began to mature, without sufficient cash in the CLO from interest and principal payments to redeem all the noteholders.

41.     Hu and Executive-1 explored various options to generate liquidity to meet the liabilities of TOF and the CLO, including raising a new fund to purchase assets from each.

42.     In or about 2017, IIG succeeded in generating interest in a new private fund, GTFF, on the part of a foreign investor ("Investor-1"), which agreed to invest $70 million as an anchor investor in the new fund.

43.     At Hu's direction, IIG used Investor-1's investment and subsequent smaller investments by two other foreign investors to purchase loan assets from TOF and the CLO for the GTFF portfolio.  The assets purchased included approximately $44 million in fake Substitute Loans and Panama Loans.

44.     In addition, Hu caused GTFF to purchase approximately $28 million in loans (the "Argentina Loans") to an Argentine borrower (the "Argentine Borrower") from the CLO.  At the time of the transaction, Hu knew that the Argentina Loans were disputed, with the borrower claiming that the loans had been fully satisfied and IIG claiming the Argentine Borrower was in default.  Hu failed to disclose the dispute concerning the Argentina Loans to GTFF and caused

the fund to purchase the loans at par plus accrued interest, a price materially higher than the actual value of the assets in light of the claimed payoff and default.

45.     Later that same year, Investor-1 asked IIG to create another fund, STFF, to facilitate an additional $130 million investment.

46.     IIG still was in need of fresh capital to fully redeem the CLO noteholders and bail out TOF and agreed to establish STFF to facilitate Investor-1's additional investment.

47.     Hu then caused STFF to acquire approximately $10 million in fake Substitute Loans and Panama Loans from TOF and the CLO.

48.     In addition, Hu caused STFF to acquire $25 million in disputed Argentina Loans from the CLO.  As in the case of the GTFF transactions, Hu caused STFF to pay full price for the Argentina Loans and did not inform STFF or Investor-1 that the loans were disputed.

49.     The sale of the fake loans and over-valued Argentina Loans to GTFF and STFF operated as a fraud on those funds and resulted in substantial financial damage to those clients.

### IIG Defrauds the Retail Fund

50.     In addition to serving as the investment adviser to the Private Funds, beginning in or about December 2012, IIG became an investment adviser to a portion of the assets of a retail mutual fund, the Retail Fund.

51.     In its capacity as an adviser to the Retail Fund, IIG recommended that it invest in participation interests in trade finance loans originated by IIG.  IIG was compensated for its recommendations with a percentage of the cash flows from the loans it recommended.

52.     Loans to the Argentine Borrower were among the loans in which the Retail Fund invested at IIG's recommendation.

53.     In or about February 2017, the Argentine Borrower was delinquent on a principal payment of approximately $6 million on a facility owned by the Retail Fund that was maturing.

54.     The Retail Fund informed IIG that it had an additional $6 million to invest and was interested in further lending to the Argentine Borrower, but only if the Argentine Borrower repaid the past-due loan in full.

55.     At the time, the Retail Fund was a crucial source of liquidity for IIG as a purchaser of participations in loans held by the Private Funds.  Hu became concerned that a default on the Argentina Loan could result in the Retail Fund ending the relationship with IIG.

56.     On or about March 7, 2017, to make it appear as though the default on the Argentina Loan had been cured, Hu instructed that approximately $6 million be transferred into a collection account of the Argentine Borrower from the collection account of a different borrower ("Borrower-1").  He further instructed that the funds be used to make the outstanding payment that the Argentine Borrower owed to the Retail Fund.

57.     That same day, Hu instructed Employee-1 to present the Retail Fund with the opportunity to invest a fresh $6 million in a fictitious loan that IIG supposedly had recently made to the Argentine Borrower (the "New Argentina Loan").  The New Argentina Loan was fake and was created by Hu solely for the purpose of defrauding the Retail Fund.  Acting on Hu's instructions, Employee-1 prepared and furnished the Retail Fund with documentation purportedly memorializing the New Argentina Loan, including a fake notarized promissory note and credit agreement.

58.     None of the $6 million invested by the Retail Fund was loaned to the Argentine Borrower.  Instead, Hu directed that the proceeds be transferred to the account of Borrower-1 to reimburse that account for the earlier withdrawal.

59.     The purchase of the New Argentina Loan resulted in a $6 million loss to the Retail Fund.

## FIRST CLAIM FOR RELIEF

### Sections 206(1) and (2) of the Advisers Act

60.     The Commission realleges paragraphs 1 through 59, above.

61.     Hu, who had an adviser-client relationship with, and therefore owed a fiduciary duty to, the Private Funds and the Retail Fund, violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S. Code § 80b-6(1), (2)].

62.     From at least October 2013 to the present, while acting as an investment adviser, Defendant, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (a) employed a device, scheme, or artifice to defraud a client or prospective client; and/or (b) engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon a client or prospective client.

63.     Specifically, Hu knowingly reported false valuations of the Substitute Loans to investors in TOF, resulting in the firm paying higher fees to IIG and ultimately Hu than it should have.

64.     In addition, Hu knowingly sold participations in overvalued or fake loans, including certain of the Substitute Loans, Panama Loans, and Argentina Loans to the CLO, GTFF, and STFF, and knowingly sold the $6 million participation in the fake New Argentina Loan to the Retail Fund, each which he falsely represented as though they were participations in performing loans.

## SECOND CLAIM FOR RELIEF

### Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c) Thereunder

65.     The Commission realleges paragraphs 1 through 59, above.

66.     IIG violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

67.     From at least October 2013 to the present, Defendant, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any person.

68.     Specifically, Hu knowingly sold participations in overvalued or fake loans, including certain of the Substitute Loans, Panama Loans, and Argentina Loans to the CLO, GTFF, and STFF and knowingly sold the $6 million participation in the fake New Argentina Loan to the Retail Fund, each which he falsely represented as though they were participations in performing loans.

## THIRD CLAIM FOR RELIEF

### Sections 17(a)(1), (2), and (3) of the Securities Act

69.     The Commission realleges paragraphs 1 through 59, above.

70.     Hu violated Section 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

71.     From at least October 2013 to the present, Defendant, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the offer or sale of securities, and with knowledge, recklessness, or negligence, (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities being offered or sold.

72.     Specifically, Hu knowingly sold participations in overvalued or fake loans, including certain of the Substitute Loans, Panama Loans, and Argentina Loans to the CLO, GTFF, and STFF and knowingly sold the $6 million participation in the fake New Argentina Loan to the Retail Fund, each which he falsely represented as though they were participations in performing loans.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court grant the following relief:

## **I.**

A final judgment permanently restraining and enjoining Defendant from directly or indirectly committing future violations of Section 206 of the Advisers Act [15 U.S.C. § 80b-6], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

**II.**

A final judgment ordering Defendant to disgorge all ill-gotten gains or unjust enrichment, plus prejudgment interest thereon;

**III.**

A final judgment ordering Defendant to pay civil monetary penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

**IV.**

Granting such other and further relief as the Court deems just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated: New York, New York
       July 17, 2020

                    Respectfully submitted,


                    By:  /s/ Daniel Michael
                         Marc P. Berger
                         Sanjay Wadhwa
                         Sheldon Pollock
                         Daniel Michael
                         Osman Nawaz
                         Philip A. Fortino
                         Lindsay S. Moilanen
                         SECURITIES AND EXCHANGE
                           COMMISSION
                         New York Regional Office
                         200 Vesey Street, Suite 400
                         New York, NY 10281-1022
                         (212) 336-1014 (Fortino)